E-FILED
Monday, 24 August, 2026 04:52:11 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
KANKAKEE DIVISION**

| | |
|---|---|
| **DEBRA MICHNIAK and DAVID RITCHIE, individually and on behalf of all others similarly situated,**<br>**Plaintiffs,**<br>**v.**<br>**RIVERSIDE HEALTH SYSTEM**<br>**Defendant.** | **Case No. 2:26-cv-02059**<br>**Hon. Chief Judge Colin Stirling Bruce**<br>**Hon. Magistrate Judge Eric I. Long** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

FACTS ..... 2

FEDERAL RULE 12(b)(6) STANDARD ..... 4

ARGUMENT ..... 4

I. PLAINTIFFS PLAUSIBLY ALLEGE THAT RIVERSIDE VIOLATED THE ELECTRONIC COMMUNICATIONS PRIVACY ACT. ..... 4

A. Plaintiffs Plausibly Allege that Defendant Intercepted the Contents of Their Communications. ..... 5

B. Because Plaintiffs Allege That Riverside Criminally or Tortiously Violated HIPAA, Its Conduct is Not Immunized By the One-Party Consent Rule. ..... 8

C. The Plain Text of the ECPA, Legislative History, and Binding Precedent All Confirm That Liability Turns on Whether the Intended Use of the Intercepted Communications Was to Commit a Criminal or Tortious Act. ..... 10

D. Riverside's Unauthorized Disclosure of Patient Protected Health Information is Independent of Its Interception of Communications. ..... 14

E. Riverside's Knowing Disclosure of PHI violates HIPAA and Thus, Its Conduct Falls Squarely Within the Crime-Tort Exception. ..... 15

II. PLAINTIFFS STATE A VIABLE NEGLIGENCE CLAIM UNDER ILLINOIS LAW ..... 19

CONCLUSION ..... 21

# TABLE OF AUTHORITIES

**Cases** **Page(s)**


*Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009) ... 4

*B.N. v. Oregon Reproductive Medicine, LLC, d/b/a ORM Fertility*,
2026 WL 915343 (D. Or. April 3, 2026) ... 19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 570 (2007) ... 4

*Bogenberger v. Pi Kappa Alpha Corp.*,
2018 IL 120951 ... 20

*By-Prod Corp. v. Armen-Berry Co.*,
668 F.2d 956 (7th Cir. 1982) ... 11

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010) ... 8, 12, 14

*Cowper v. Nyberg*,
2015 IL 117811 ... 19

*Derfus v. City of Chicago*,
42 F. Supp. 3d 888, 893 (7th Cir. 2014) ... 4

*Desnick v. American Broadcasting Cos.*,
44 F.3d 1345 (7th Cir. 1995) ... 11, 13

*Doe 1 v. Chestnut Health Sys., Inc.*,
2025 WL 1616635 (C.D. Ill. June 6, 2025) ... 12

*Doe v. Baystate Health Sys., Inc.*,
2026 WL 776861 (D. Mass. Mar. 19, 2026) ... 7

*Doe v. Genesis Health Sys.*,
2025 WL 1000192 (C.D. Ill. Mar. 18, 2025) ... 12

*Doe v. Tenet Healthcare Corp.,*
789 F. Supp. 3d 814 (E.D. Cal. 2025) ... 7

*Flores v. Aon Corp.*,
2023 IL App (1st) 230140 ... 20

*Gittings-Barrera v. Memorial Hospital Ass'n, No*.,
2025 WL 2776142 (C.D. Ill. Sept. 26, 2025) .......... 19

*Hannant v. Culbertson Memorial Hospital Foundation, d/b/a/ Sarah D. Culbertson Memorial Hospital*,
2026 WL 777296 (C.D. Ill. March 19, 2026) .......... 13, 14, 19

*Hartley v. Univ. of Chicago Med. Ctr.,*
2025 WL 2802317 (N.D. Ill. Oct. 1, 2025) .......... 18

*In re DoubleClick Inc. Priv. Litig.*,
154 F. Supp. 497 (S.D.N.Y. 2001) .......... 8

*In re Google Inc. Cookie Placement Cons. Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) .......... 5, 7

*In re Google RTB Consumer Priv. Litig.*,
2022 WL 2165489 (N.D. Cal. June 13, 2022) .......... 7

*In re Grp. Health Plan Litig*.,
709 F. Supp. 3d 707 (D. Minn. 2023) .......... 7

*In re High Fructose Corn Syrup Antitrust Litigation*,
216 F.3d 621 (7th Cir. 2000) .......... 11, 13

*In re Meta Pixel Healthcare Litig*.,
2022 WL 17869218 (N.D. Cal. Dec. 22, 2022) .......... 7, 17

*In re Zynga Privacy Litigation*,
750 F.3d 1098 (9th Cir. 2014) .......... 6

*Kane v. Univ. of Rochester*,
2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024) .......... 9

*Kurowski v. Rush System for Health*,
2024 WL 3455020 (N.D. Ill. July 18, 2024) .......... 13

*Mayer v. Midwest Physician Admin. Servs., LLC,*
2025 WL 963779 (N.D. Ill. Mar. 31, 2025) .......... 19

*Mekhail v. N. Mem'l Health Care,*
726 F. Supp. 3d 916 (D. Minn. 2024) .......... 7

*Pattison v. Teladoc Health, Inc.*,
2025 WL 1756364 (S.D.N.Y. June 25, 2025) .......... 19

*Platt v. Brown*,
872 F.3d 848 (7th Cir. 2017) .......... 4

*Ramirez v. LasikMD USA, Inc.*,
2026 WL 194855 (S.D. Cal. Jan. 26, 2026).......... 19

*Sabrina Roppo v. Travelers Commercial Insurance Co.*,
869 F.3d 568 (7th Cir. 2017) .......... 21

*Smith v. Loyola Univ. Med. Ctr.,*
2024 WL 3338941 (N.D. Ill. July 9, 2024).......... 7, 19

*Stein v. Edward-Elmhurst Health*,
2025 WL 580556 (N.D. Ill. Feb. 21, 2025), *motion to certify appeal granted*,
2026 WL 594752 (N.D. Ill. Mar. 3, 2026).......... 13, 19, 21

*Strong v. LifeStance Health Grp. Inc.*,
2025 WL 317552 (D. Ariz. Jan. 28, 2025) .......... 19

*Sussman v. Am. Broadcasting Cos.,*
186 F.3d 1200 (9th Cir. 1999) .......... 8, 12

*Theys v. Dental Intel., Inc.*,
2026 WL 636743 (N.D. Ill. Mar. 6, 2026).......... 19

*Thomas v. Pearl*,
998 F.2d 447 (7th Cir. 1993) .......... 11

*United States v. Zarnes*,
33 F.3d 1454 (7th Cir. 1994) .......... 11

**Statutes**

42 U.S.C. § 1320(d)(6) .......... 8, 14, 15, 16

Electronic Communications Privacy Act of 1986,
18 U.S.C. §§ 2510 et seq.......... 5, 14

**Other Authorities**

114 Cong. Rec. 14,682 (May 23, 1968).......... 10

S. Rep. No. 90-1097, 1968 U.S.C.C.A.N. 2112 (1968).......... 10

**Regulations**

45 C.F.R. § 160.103 .......... 14, 15, 17

## INTRODUCTION

Plaintiffs bring this action to redress egregious privacy violations perpetrated by their own medical provider. The facts giving rise to this and numerous other similar actions across the United States have only come to light in recent years: Defendant installed Google and Microsoft tracking technologies that surreptitiously transmit patients' highly sensitive, private, HIPAA-protected information to these vendors. In exchange, Defendant receives enhanced analytics and advertising services that enable Defendant and its vendors to target patients with advertisements based on their symptoms, treatments, and conditions.

For its part, Defendant says its non-consensual dissemination of patient data should not concern anyone. It contends that when a medical provider shares confidential, protected information about a patient for commercial gain in violation of HIPPA (a criminal act) it's no different from what "millions" of websites do. Thus, as phrased by Defendant, the patient suffers no "concrete or real-world harm", "no injury" and no basis for an action under the Electronic Communications Privacy Act of 1986 ("ECPA"), 18 U.S.C. § 2510 *et seq*. Dkt. No. 17 ("Def.'s Mem.") at 1. Although these assertions sound like a challenge to standing, it's an argument Defendant conspicuously never develops. Perhaps that's because none of the many dozens of courts around the county which have denied motions to dismiss on indistinguishable facts have never found that plaintiffs lack Article III standing to bring ECPA claims. So why defendant wastes space advancing such claims is a mystery to Plaintiffs.

Next, Defendant turns to misrepresenting the allegations of Plaintiffs' complaint, claiming (falsely) that it doesn't identify any confidential health information disclosed to any third party. Defendant's assertion is curious, given its concession that Plaintiffs not only explicitly allege this very information, but that a dispute exists over whether the data it disclosed is protected health

information ("PHI") and personally identifiable information ("PII") (collectively "Private Information"). *Id*. at 3, n. 1. Consistent with the overwhelming weight of authority, including Seventh Circuit precedent, Plaintiffs' allegations plausibly support their contention that Defendant divulged the contents of their communications in violation of the ECPA. Moreover, because Plaintiffs' allegations establish that Defendant's conduct was criminal or tortious, its conduct is not immunized by the Act's "one party consent" exception. Finally, Plaintiffs' allegations plainly give rise to a cause of action sounding in negligence. Defendants' motion must be denied.

**FACTS**

Riverside Health System ("Riverside" or "Defendant"), controls and maintains a website, *https://www.riversidehealthcare.org* (the "Website"), and encourages patients to use it for scheduling medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, and for signing up for events, classes and more. Dkt. No. 1 ("Compl.") ¶ 5.

Notwithstanding Riverside's absolute legal duty, professional obligation and express promise to maintain the confidentiality of its patients' Private Information, it intentionally embedded various third-party tracking technology on its Website, including but not limited to Google Analytics, DoubleClick, Microsoft Advertising and Microsoft Clarity (collectively "Tracking Tools"), which, unbeknownst to Plaintiffs, automatically transmitted to third parties every click, keystroke and detail about Plaintiffs' medical treatment and other Private Information. Compl. ¶¶ 48-131. The Tracking Tools are designed for commercial marketing and track every interaction made by patients on Riverside's Website. *Id.* ¶¶ 53-99. The information Defendant's Tracking Tools send to third parties include patient status, medical conditions searched by Users', names of providers whose profile pages were viewed by Users, when Users click to sign in to the

patient portal, click to pay a bill, the facility locations selected or searched by Users, User's free-text searches made via the search bar, when Users click to call their provider and every page URL the User visited on the website. *Id.* ¶ 15. Contemporaneously with the interception of these communications, the Tracking Tools also collect and transmit several identifiers that uniquely identify a given patient, including their IP address, device identifiers, cookie identifiers and Google or Microsoft account-linked identifiers. *Id.* ¶¶ 15, 53-99.

Defendant's marketing vendors then combine these identifiers with the patients' healthcare communications and use this information for commercial purposes; namely, to build a fulsome profile of the patient's preferences and traits, and to sell targeted advertisements. *Id.* ¶¶ 9, 14, 53-99. In exchange for disclosing patients' valuable Private Information, Defendant receives enhanced advertising services and more cost-efficient marketing, while its third-party vendors use that information for targeted advertising and sell it to other marketers that geo-target patients based on communications obtained through the Tracking Tools. *Id.* ¶¶ 14, 16, 223-231.

Plaintiffs Debra Michniak and David Ritchie have been Riverside patients since at least 1999 and 2010, respectively. Compl. ¶¶ 33-34. Both used the Website to schedule appointments, request information about medical services, research providers and locations, review financial-assistance resources, and access Riverside's patient portal. *Id.* ¶¶ 234, 246. Riverside automatically disclosed their Private Information to unauthorized third parties without their knowledge, consent, or authorization. *Id.* ¶¶ 235–43, 247–55.

Plaintiffs allege that the following communications containing their Private Information were intercepted and disclosed to unauthorized third parties when they communicated through Riverside's Website: (1) the specific medical services and specialties they searched; (2) the specific providers they researched; (3) the billing and insurance resource pages they reviewed; (4)

their actions of calling providers, which include the providers' names and specialties; (5) their actions of scheduling appointments; and; (6) their actions of logging into MyChart. ¶¶ 234, 246.

Riverside nevertheless represented that uses or disclosures not otherwise identified in its privacy materials required written authorization. Compl. ¶¶ 129-131. Those materials did not disclose that Riverside transmitted patients' identified interactions with healthcare webpages, provider pages and appointment tools, to advertising and analytics companies through its Tracking Tools. *Id.* Riverside made those transmissions without the written authorization its own policies required. *Id.* ¶ 131.

## FEDERAL RULE 12(b)(6) STANDARD

The purpose of a Rule 12(b)(6) motion to dismiss is to evaluate the legal sufficiency of a complaint, not decide the merits of the case. *See*, *Derfus v. City of Chicago*, 42 F. Supp. 3d 888, 893 (7th Cir. 2014). For purposes of a motion to dismiss, the Court accepts "as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017) (quotation omitted). Courts must deny a motion to dismiss pursuant to Rule 12(b)(6) if the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Id.*, at 555-56.

## ARGUMENT

### I. PLAINTIFFS PLAUSIBLY ALLEGE THAT RIVERSIDE VIOLATED THE ELECTRONIC COMMUNICATIONS PRIVACY ACT.

To state a claim under the ECPA, a plaintiff must allege the defendant: "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to

intercept (3) the contents of (4) an electronic communication, (5) using a device." *In re Google Inc. Cookie Placement Cons. Priv. Litig.*, 806 F.3d 125, 135 (3d Cir. 2015) (internal citations omitted). Plaintiffs allege that Riverside violated the ECPA by intentionally intercepting the contents of their healthcare communications through its Tracking Tools and contemporaneously transmitting them to unauthorized third parties. Compl. ¶¶ 281-288. In response, Riverside says it can never incur ECPA liability because its conduct falls within the Act's "one party consent" exception. But Defendant ignores Plaintiffs' well-pled allegations, which anticipate and specifically explain that because Riverside's conduct constitutes a crime or tort, the exception upon which it relies does not apply. The Court should reject Defendant's invitation to resolve disputed, dispositive facts at the pleading stage.

### A. Plaintiffs Plausibly Allege that Defendant Intercepted the Contents of Their Communications.

Defendant first contends that Plaintiffs fail to state a claim under the ECPA because the communications Riverside intercepted and disclosed to advertising vendors do not include the "content" of the communications as defined by the ECPA. Def.'s Mem. at 6-9. The ECPA broadly defines "content" to include "any information concerning the substance, purport, or meaning of [an electronic] communication." 18 U.S.C. § 2510(8).

According to Defendant, the healthcare communications it intercepted that <u>**explicitly**</u> describe (1) the specific medical services and specialties Plaintiffs searched for; [1] (2) the specific providers they researched; (3) the billing and insurance resource pages they reviewed; (4) their actions of calling providers, which include the provider's name and specialty; (5) their action of

[1] Confusingly, in a footnote, Defendant appears to concede that URLs embedded with "search queries" can constitute "content" under the ECPA but claims Plaintiffs have not plead the interception of such communications. *See* Def.'s Mem. at 7, n.3. In reality, Plaintiffs explicitly allege the disclosure URLs containing their search queries for specific medical services. *See* Compl. at ¶¶ 234, 246.

scheduling appointments; and (6) their action of logging into MyChart, somehow do not convey the "substance, purport, or meaning" of their communications. *See* Compl. at ¶¶ 234-235, 246-247. That position defies Plaintiffs' allegations and common sense.

These transmissions are not mere "record information" that identify where a communication was sent or its technical characteristics. *See* Def.'s Mem. at 6-9. They explicitly identify the pages Plaintiffs viewed and the actions they took with respect to their own medical care. Riverside also transmitted that information contemporaneously with Plaintiffs' IP addresses and persistent Google and Microsoft identifiers, including the IDE, NID, _Secure-ENID, DSID, SID, and MUID cookies, allowing each communication to be linked to the specific patient who made it. Compl. ¶¶ 53-99, 101-107, 118-119.

This behavioral data is exceedingly valuable, which is why Riverside, Google, Microsoft, and other third-party advertisers seek to collect and monetize it. The Tracking Tools use the resulting information to measure advertising conversions, create advertising audiences, and target patients with advertisements based on their health care activity. *Id*. ¶¶ 53-99, 111-113, 224-230. They can perform those functions only by collecting and analyzing the substance of patients' communications to determine who they are and what health care activities they are undertaking. The Tracking Tools' disclosure of Plaintiffs' specific health care activities was not incidental to their operation; it is the reason Riverside installed and used them. Defendant cannot avoid liability by mischaracterizing the very information its Tracking Tools were designed to collect and exploit.

While Defendant relies heavily on *In re Zynga Privacy Litigation*[2] to support the notion that the information it divulges does not constitute the "contents" of Plaintiffs' communications

---

[2] *See* Def.'s Mem. at 7-8 (citing *Zynga*, 750 F.3d 1098, 1106-07 (9th Cir. 2014)).

under the ECPA, its interpretation of *Zynga* has been consistently and uniformly rejected in healthcare tracking cases involving indistinguishable allegations. Most notably, in the consolidated lawsuit against Meta relating to the use of its Tracking Tools on hospital websites nationwide, the Northern District of California ruled that the same sort of URL disclosures Plaintiffs have pled represent "content," explaining:

> [T]he kinds of descriptive URLs identified in the Smith Decl. are "contents" within the meaning of the statute. Unlike in *Zynga*, the URLs at issue here would not merely reveal the name of a Facebook user or group—as Smith explained, the transmitted URLs include both the "path" and the "query string." [citations omitted] (showing hardfordhospital.org/services/digestive-health/conditions-we-treat/colorectal-small-boweldisorders/ulcerative-colitisURL). These items are content because they concern the substance of a communication. *See Zynga*, 750 F.3d at 1107; *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 137 (3d Cir. 2015) ("If an address, phone number, or URL is... part of the substantive information conveyed to the recipient, then by definition it is 'content'"); *see also In re Google RTB Consumer Priv. Litig.*, 2022 WL 2165489, *10 (N.D. Cal. June 13, 2022) (finding that categories of the website, categories that describe the current section of the website, and referrer URL that caused navigation to the current page constituted "content").

*In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, *11 (N.D. Cal. Dec. 22, 2022).

Since then, courts addressing materially identical healthcare tracking allegations, including several courts within this Circuit, have repeatedly concluded that descriptive URLs and event data revealing a patient's specific activity on a healthcare website can constitute the contents of a communication under the ECPA.[3] Those decisions confirm what Plaintiffs' allegations make plain: when a transmission reveals the healthcare information a patient sought, the provider they researched, or the healthcare actions they took, it conveys the "substance, purport, or meaning" of

[3] *Smith v. Loyola Univ. Med. Ctr.,* 2024 WL 3338941, at *6 (N.D. Ill. July 9, 2024); *Doe v. Baystate Health Sys., Inc.,* 2026 WL 776861, at *5 (D. Mass. Mar. 19, 2026); *Doe v. Tenet Healthcare Corp.,* 789 F. Supp. 3d 814, 837–38 (E.D. Cal. 2025); *Mekhail v. N. Mem'l Health Care,* 726 F. Supp. 3d 916, 925–26 (D. Minn. 2024); *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d 707, 718 (D. Minn. 2023).

the communication regardless of whether that information appears in a URL or event data. Riverside's contrary and wholly unsupported argument should be rejected.

### B. Because Plaintiffs Allege That Riverside Criminally Violated HIPAA, Its Conduct is Not Immunized By the One-Party Consent Rule.

Riverside is subject to liability under the "criminal or tortious exception" of the ECPA because, as Plaintiffs allege, it intercepted their communications for the purpose of disclosing their protected health information in violation of HIPAA. Compl. ¶¶ 48, 120. Where the crime-tort exception applies, the exception overrides the one-party consent rule of the Act.[4] Courts consistently interpret the crime-tort exception as requiring only, "sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is independent of the intentional act of recording." *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010). In other words, "Under section 2511, 'the focus is not upon whether the interception itself violat[ed] another law; it is upon whether the purpose for the interception—**its intended use**—was criminal or tortious.'" *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 497, 516 (S.D.N.Y. 2001) (emphasis added) (quoting *Sussman v. Am. Broadcasting Cos.,* 186 F.3d 1200, 1202 (9th Cir. 1999)).

Here, Plaintiffs allege that Defendant intercepted their healthcare communications for the purpose of disclosing their Private Information to unauthorized third-party digital advertising companies in direct violation of HIPAA. Compl. ¶¶ 48, 118-20, 142-159, 222-231. *See* 42 U.S.C. § 1320d-6. Defendant's Tracking Tools are used solely for commercial marketing. Compl. ¶¶ 222-

[4] *See* 18 U.S.C. § 2511(2)(d) ("It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication … ***unless such communication is intercepted for the purpose of committing any criminal or tortious act*** in violation of the Constitution or laws of the United States or of any State.") (emphasis added).

231. Fundamentally, the **only way** Riverside benefits from using these tools is by disclosing its patients' sensitive medical communications and linking these activities to their identities. This Private Information is then used by Defendant and its vendors to build advertising profiles and target patients with ads that relate to the healthcare activities they communicated on Riverside's Website. *Id*. Thus, to realize these benefits, Riverside had to make the conscious decision to install and configure its Tracking Tools to intercept and disclose its patients' statutorily protected health information to third-party advertisers. As a result, Defendant's alleged conduct fits squarely within the "criminal or tortious" carve-out to the "one-party consent" exception to the ECPA because it intercepted patient communications for the purpose of violating HIPAA.

Accepting Riverside's argument for dismissal would require ignoring the specific conduct that makes the alleged interceptions unlawful—the unauthorized disclosure of protected health information. According to Defendant, "[i]f Riverside's *only* purpose in deploying the Tracking Tools was commercial, then – as a matter of logic – there can be no room for an additional purpose of committing a criminal or tortious act." Def.'s Mem. at 10. But Plaintiffs do not allege that commercial marketing, in the abstract, violates the ECPA. They allege that Riverside installed and configured its Tracking Tools to intercept its patients' protected health information and send it, along with patient-identifying data, to unauthorized advertising vendors for commercial gain. That is the pleaded purpose that matters. Defendant is not entitled to dismissal merely by recasting the alleged unauthorized disclosure of protected health information as ordinary "marketing." Whether the crime-tort exception applies is, at a minimum, a disputed question of fact. *See, e.g.*, *Kane v. Univ. of Rochester*, 2024 WL 1178340, at *8 (W.D.N.Y. Mar. 19, 2024) ("Defendant may be able to show that, as a factual matter, that they did not intercept Plaintiffs' communications for that

purpose. But at this stage of the proceedings, Plaintiffs, without the benefit of discovery, have plausibly alleged that the tort-crime exception applies.”).

### C. The Plain Text of the ECPA, Legislative History, and Binding Precedent All Confirm That Liability Turns on Whether the Intended Use of the Intercepted Communications Was to Commit a Criminal or Tortious Act.

One question runs through the legislative history and every decision of the Seventh Circuit construing the crime-tort exception to the ECPA: what did the interceptor intend to do with the communication it intercepted? Not what it hoped to gain, and not whether it first consulted the United States Code so that it understood it was violating the law. Riverside fails to mention any of this binding authority and instead points to several district court cases and two appellate decisions from other circuits (which, ironically, follow the same correct standard as the Seventh Circuit), to support its claim that the “for the purpose of” language in Section 2511(2)(d) requires an ECPA plaintiff to allege the defendant “acted with the conscious object of committing a crime or tort beyond the interception itself.” Not so.

Congress first adopted a broad one-party consent rule, and in 1968, Senator Philip Hart proposed the crime-tort exception to prevent a party from exploiting an intercepted communication for criminal or tortious ends. *See* Cong. Rec. – Senate, 114 Cong. Rec. 14682, 14694 (May 23, 1968)). When he proposed the amendment, Senator Hart commented that he intended to combat interceptions made for “insidious purposes such as blackmail, stealing business secrets, or other criminal or tortious acts.” S. Rep. No. 90-1097, at 90, 1968 U.S.C.C.A.N. 2112, 2236 (1968). Blackmail and the theft of business secrets are profit-motivated crimes. If a motive to make money negated the exception, Congress’s paradigm examples would fall outside the statute intended to encompass them. Senator Hart’s remarks also distinguished intended uses that would trigger the exception, such as “blackmailing” or “abuses of the right of privacy,” from legitimate uses, such

as preserving evidence of criminal activity or protecting a conversation from later distortion. *Id*. The legislative history therefore confirms the same inquiry reflected in the statutory text and this Court's precedent: what matters is the act the interceptor intended to accomplish with the intercepted communication, not whether the interceptor's broader objective—in a vacuum—could be characterized as lawful.

*By-Prod Corp. v. Armen-Berry Co*., 668 F.2d 956 (7th Cir. 1982) is the Seventh Circuit's first decision interpreting the crime-tort exception and provides the relevant framework that every subsequent Seventh Circuit decision has followed. Tracking the statutory language, the Court held that the crime-tort exception turns on whether "the purpose of the interception is to ***commit an act*** *that is criminal or tortious* under federal or state law." *By-Prod Corp*., 668 F.2d at 959 (emphasis added). In *By-Prod*, the exception did not apply because the recorder intended to preserve evidence for litigation, not use the recording to commit a crime such as blackmail. *Id*. at 959-60. The Court thus distinguished between an abstract motive and the intended use of the recording, asking whether that use was itself criminal or tortious, not whether the interceptor subjectively understood or desired their act to violate the law. The Seventh Circuit has consistently applied this intended use inquiry in every subsequent case addressing the crime-tort exception. *See In re High Fructose Corn Syrup Antitrust Litigation*, 216 F.3d 621, 626 (7th Cir. 2000) ("[W]hen the law speaks of recording conversations with a criminal or tortious purpose, it has, we think, regard for the intended use of the recordings."); *see also Thomas v. Pearl*, 998 F.2d 447, 451-453 (7th Cir. 1993); *United States v. Zarnes*, 33 F.3d 1454, 1469 (7th Cir. 1994); *Desnick v. American Broadcasting Cos*., 44 F.3d 1345, 1353 (7th Cir. 1995).[5]

[5] Defendant's out of circuit authorities apply the same intended use inquiry. *See* Def.'s Mem. at 11. *Sussman*

Respectfully, the two decisions cited by Defendant for the proposition that a lawful motive can negate an unlawful intended use were incorrectly decided and conflict with binding Seventh Circuit authority. *See* Def.'s Mem. at 10-11 (citing *Doe v. Genesis Health Sys*., 2025 WL 1000192 (C.D. Ill. Mar. 18, 2025) and *Doe 1 v. Chestnut Health Sys*., *Inc*., 2025 WL 1616635 (C.D. Ill. June 6, 2025)). Both cases involved allegations that a healthcare provider violated the ECPA by using Tracking Tools to intercept and disclose patients' communications to third-party advertisers in violation of HIPAA. *Genesis Health Sys*., 2025 WL 1000192, at *2; *Chestnut Health Sys*., *Inc*., 2025 WL 1616635, at *2. In *Genesis*, the court reasoned that, "[b]y Plaintiff's own account, the 'trackers' were 'used by the Defendant to benefit Defendant and its marketing and advertising purposes,' not for the purpose of knowingly committing a violation of the HIPAA." 2025 WL 1000192, at *9. *Chestnut* followed the same path. It treated the allegation that the defendant disclosed patients' information "for the purpose of creating targeted online advertisements and enhanced marketing services" as inconsistent with an unlawful purpose and concluded that the plaintiffs had not alleged facts supporting an inference that the defendant acted with a "tortious or criminal purpose." *Chesnut Health Sys*., *Inc*., 2025 WL 1616635, at *12. Thus, both decisions effectively required plaintiffs to allege that the healthcare provider specifically intended to violate the law, reasoning that the provider's asserted marketing objective somehow negated its unlawful intended use.

---

expressly held that "the existence of a lawful purpose would not sanitize a tape that was also made for an illegitimate purpose" and that the relevant question is whether "the purpose for the interception—its intended use—was criminal or tortious." *Sussman v. American Broadcasting Cos*., 186 F.3d 1200, 1202 (9th Cir. 1999). *Caro* likewise held that "[a]t the time of the recording the offender must intend to use the recording to commit a criminal or tortious act." *Caro v. Weintraub*, 618 F.3d 94, 99 (2d Cir. 2010). Neither decision supports Defendant's construction that a lawful motive negates an unlawful intended use.

The problem with this reasoning, however, is that it improperly conflates a defendant's broader motive with its intended use of the intercepted communications. The Seventh Circuit has expressly distinguished the two. The crime-tort exception concerns "the intended use of the recordings," while the defendant's "motive in making the recordings" is irrelevant. *See In re High Fructose*, 216 F.3d at 626.[6] Here, Riverside's alleged (and unproven) motive was to improve its advertising and marketing. But its intended use of Plaintiffs' communications, as they specifically allege, was to disclose their contents, including their protected health information, to third-party advertisers without authorization. Compl. ¶¶ 48, 118-20, 142-159, 222-231. The fact that Riverside may have committed that unlawful disclosure to improve its marketing does not transform the disclosure into a lawful act.

More recently, a court in this district, *Hannant v. Culbertson Memorial Hospital Foundation*, decided after both *Genesis* and *Chestnut*, rejected precisely that reasoning in accordance with the overwhelming weight of authority. 2026 WL 777296, at *7-8 (C.D. Ill. Mar. 19, 2026). There, the plaintiff similarly alleged that a healthcare provider used Tracking Tools to intercept and disclose patients' healthcare communications to third-party advertisers in exchange for improved marketing services. *Id*. at *1-2. The court held that "a hospital could intercept a patient's IIHI for the purpose of disclosing it to third parties in violation of HIPAA even if its ultimate motivation was monetary," explaining that "criminal acts are routinely motivated by the

[6] *See also Kurowski v. Rush System for Health*, 2024 WL 3455020, at *4 (N.D. Ill. July 18, 2024) (discussing *Desnick*, 44 F.3d 1345 (7th Cir. 1995)) ("*Desnick* does not say, or suggest that the defendant must know that the criminal or tortious act it is committing is, in fact, a crime or tort."); *Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *6 (N.D. Ill. Feb. 21, 2025), *motion to certify appeal granted*, 2026 WL 594752 (N.D. Ill. Mar. 3, 2026) (applying the ECPA's crime-tort exception and holding "[t]he existence of an underlying financial motivation does not mean that the act lacked a criminal or a tortious purpose. That's like saying that a bank robber's purpose was not to commit a crime—it was to make money.").

possibility of financial gain" and that HIPAA itself imposes heightened penalties for disclosures made for commercial advantage or personal gain. *Id.* at *7 (citing 42 U.S.C. § 1320d-6(b)(3)). Thus, "[t]he fact that Culbertson's ultimate end was financial does not insulate it from the reasonable conclusion that it acted for the purpose of committing an act that was criminal or tortious." *Id*. at *8. *Hannant* also rejected the contention that the intercepted information was merely "record information," holding that communications revealing "the name and location of her personal physician, the medical treatment she researched, … her treatment search information, … and her log in and use of the patient portal," "rises far above the level of 'record information' and is appropriately considered 'contents.'". *Id.*

Under binding Seventh Circuit authority and the statute's plain language, the lawful character of Riverside's ultimate motive does not sanitize its unlawful intended use of Plaintiffs' communications.

**D. Riverside's Unauthorized Disclosure of Patient Protected Health Information is Independent of Its Interception of Communications.**

Riverside also challenges whether Plaintiffs have sufficiently alleged that its criminal conduct is "independent from the intentional act of recording." Def.'s Mem. at 12 (quoting *Caro*, 618 F.3d at 100.). The ECPA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510 (4). HIPAA defines "disclosure" as "the release, transfer, provision of access to, or divulging in any manner of information outside the entity holding the information." 45 C.F.R. § 160.103. Defendant does not violate HIPAA by *acquiring* the contents of the communications on its web properties. Rather, Riverside violates HIPAA when it uses its Tracking Tools to *disclose* its patients' communications to advertisers, thereby divulging its

patients' protected health information for its own commercial benefit. Compl. at ¶¶ 48, 219-221. As Plaintiffs allege, when a patient communicates with Defendant's Website by clicking links, viewing pages, and entering information, Riverside uses the Tracking Tools to "intercept, duplicate and redirect" those communications to Google and Microsoft. Compl. ¶¶ 90-93. Thus, while the two events (interception and disclosure) occur simultaneously, Defendant's conduct in disclosing its patients' PHI is independent from its conduct in intercepting it.

Accordingly, because Riverside's alleged HIPAA violation arises from its distinct act of disclosing the intercepted communications to unauthorized third parties, Plaintiffs plausibly allege a criminal act independent of the interception itself.

### E. Riverside's Knowing Disclosure of PHI violates HIPAA and Thus, Its Conduct Falls Squarely Within the Crime-Tort Exception.

HIPAA provides civil and criminal penalties to any covered entity that "knowingly… discloses individually identifiable health information ["IIHI"] to another person." 42 U.S.C. § 1320d-6.[7] IIHI is a subset of protected health information and defined as:

> any information, including demographic information collected from an individual, that— (A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and— (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

45 C.F.R. § 160.103.

The communications Riverside intercepted and disclosed to third parties are

[7] Section 1320d-6 imposes heightened penalties when an unauthorized disclosure "is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6(b)(3). Defendant's asserted commercial motive thus aggravates the offense; it does not make the disclosure lawful.

unquestionably protected IIHI. Plaintiffs allege that the Tracking Tools intercept both the contents of patient communications with Defendant's Website (*i.e.*, the URLs, buttons, links, pages, and tabs patients click and view) and identifiers that uniquely identify the patient (*i.e.* the patient's IP addresses, cookie identifiers, device identifiers and account identifiers). Compl. ¶ 98. The Tracking Tools also intercept and disclose the communications generated when patients click to login to Riverside's MyChart patient portal, or call a provider, including provider's name, specialty and location. *Id.* ¶¶ 234, 246. Thus, for example, Riverside reveals to its marketing vendors that a specific, identified patient has viewed pages related to cancer treatments, clicked on a provider's profile, called the provider, and logged into MyChart. Therefore, Riverside may be prosecuted and incur liability under 43 U.S.C. § 1320d-6 because the data it discloses is received by a health care provider, identifies the individual, and is related to their past, present, or future physical or mental health or condition, their receipt of health care, and/or their payment for that care.

Contemporaneously with each disclosure of a patient's healthcare communication, Riverside's Tracking Tools also disclosed IP addresses and persistent cookie, device, and account identifiers that allow Google and Microsoft to recognize and track the patient across sessions. Compl. ¶¶ 98, 101, 202-221, 234-235, 246-247. Because the combined data concerns both the patient's healthcare and provides a reasonable basis to identify that patient, it constitutes IIHI under 45 C.F.R. § 160.103. That is more than enough at the pleading stage: Plaintiffs do not allege that Riverside disclosed anonymous website activity, but rather that it disclosed healthcare communications together with identifiers that HIPAA itself treats as rendering health information individually identifiable.

Plaintiffs also allege that Riverside disclosed their patient status by transmitting their

MyChart login activity together with identifying information. Compl. ¶¶ 144-150, 234-235, 246-247. *See In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *7–8 (N.D. Cal. Dec. 22, 2022) (holding that a patient-portal login click, transmitted with the portal URL and identifying information, revealed patient status protected by HIPAA). Accordingly, Plaintiffs plausibly allege that Riverside violated HIPAA by knowingly disclosing their patient status to advertisers.

While not denying it is a HIPAA-covered entity, Riverside contends that the healthcare communications it disclosed through descriptive URLs and event data do not qualify as IIHI because they do not "relate to" Plaintiffs' healthcare or identify them. Def.'s Mem. at 14-15. Again, Defendant's argument relies on ignoring Plaintiffs' allegations. Defendant claims that the explicit healthcare communications that describe Plaintiffs' healthcare activity cannot "plausibly relate to" them because "[t]he Complaint does not allege what medical conditions Michniak has," and "Ritchie's allegations [that] reference specific medical conditions…do[] not connect those conditions to any particular information he entered into or searched for on the Website." Def.s' Mem. at 15. Putting aside that both Plaintiffs allege Riverside disclosed event data that explicitly reveals the specialty, name and location of the providers they called, the idea that Plaintiffs must publicly disclose their medical conditions to establish that their communications about obtaining healthcare "relate to them" is absurd. Regardless, HIPAA broadly defines IIHI to include information that "[r]elates to . . . the provision of health care to an individual" and either "identifies the individual" or provides "a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103. Communications linking Plaintiffs to the providers they contacted, transmitted with persistent identifiers, readily satisfy that standard. Compl. ¶¶ 98-102, 202-221, 234-235, 246-247.

Riverside also suggests that Plaintiffs' "IP addresses, cookie identifiers, device identifiers and account numbers," which are literally used to identify and target them with ads based on their healthcare activities, do not actually identify them. Def.'s Mem. at 15-16. *Compare*, Compl. ¶¶ 53-83, 202-221. But Plaintiffs allege that they maintained Google accounts throughout the statutory period and that Google uses these identifiers to connect their Website activity to existing accounts or other unique user profiles. Compl. ¶¶ 33-34, 44, 55, 235, 247. That connection identifies the "flesh-and-blood" individuals whose healthcare information Riverside disclosed, which is all HIPAA requires. Moreover, the HHS Bulletin cited in Plaintiffs' complaint, which represents the federal government's best and most current guidance on the perils of tracking technology used in the healthcare context, expressly warns that "an individual's IP address or geographic location, device IDs, or any unique identifying code," can qualify as IIHI when paired with specific healthcare activities.[8]

That is exactly what Plaintiffs allege: Riverside paired their healthcare communications with identifiers that allow Google and Microsoft to identify them. Compl. ¶¶ 98-107, 215-221, 234-235, 246-247. Courts interpreting HIPAA in materially identical tracking-tool cases have reached the same conclusion, holding that communications on a healthcare provider's public webpages can contain IIHI under HIPAA. *See e.g. Hartley v. Univ. of Chicago Med. Ctr.,* 2025 WL 2802317, at *9 (N.D. Ill. Oct. 1, 2025); *Mayer v. Midwest Physician Admin. Servs., LLC,* 2025

[8] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at *https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online tracking/index.html* (last visited Aug. 24, 2026).

WL 963779, at *3 (N.D. Ill. Mar. 31, 2025); *Stein*, 2025 WL 580556, at *6; *Smith*, 2024 WL 3338941, at *7.[9]

All these facts, taken together and accepted as true, state a plausible claim that Riverside used its Tracking Tools to intercept and disclose statutorily protected health information in violation of HIPAA. Because Plaintiffs allege facts showing that the crime-tort exception applies, Plaintiffs state viable claim under the ECPA and Defendant's motion should be denied.

## II. PLAINTIFFS STATE A VIABLE NEGLIGENCE CLAIM UNDER ILLINOIS LAW

To state a claim for negligence, Plaintiffs must allege facts showing that "(1) the defendant owed a duty of care to the plaintiff, (2) that the defendant breached that duty, and (3) that the breach was the proximate cause of plaintiff's injuries." *Cowper v. Nyberg*, 2015 IL 117811, ¶ 13. Defendant challenges only the first element of Plaintiffs' negligence claim, *i.e.* that it owed Plaintiffs a duty of care. Def.'s Mem. at 18. Courts addressing materially identical claims have repeatedly rejected that argument. Most recently, in an action alleging that an Illinois hospital used website tracking technologies to disclose patients' private health information to third parties, this Court held that earlier decisions declining to recognize such a duty were "unpersuasive because they were decided on old law" preceding the 2017 amendment to the Illinois Personal Information Protection Act. *Gittings-Barrera v. Memorial Hospital Ass'n, No.*, 2025 WL 2776142, at *5 (C.D. Ill. Sept. 26, 2025). After observing that courts have "uniformly found plausible negligence claims premised on a defendant's unauthorized disclosure of non-public health information in materially

[9] *B.N. v. Oregon Reproductive Medicine, LLC, d/b/a ORM Fertility*, 2026 WL 915343, at *5 (D. Or. April 3, 2026); *Hannant v. Culbertson Memorial Hospital Foundation, d/b/a/ Sarah D. Culbertson Memorial Hospital*, 2026 WL 777296, at *8 (C.D. Ill. March 19, 2026); *Theys v. Dental Intel., Inc.*, 2026 WL 636743, at *12-13 (N.D. Ill. Mar. 6, 2026); *Ramirez v. LasikMD USA, Inc.*, 2026 WL 194855, at *3 (S.D. Cal. Jan. 26, 2026); *Pattison v. Teladoc Health, Inc.*, 2025 WL 1756364 at *3 (S.D.N.Y. June 25, 2025); *Strong v. LifeStance Health Grp. Inc*., 2025 WL 317552, at *4-5 (D. Ariz. Jan. 28, 2025).

identical circumstances," the court concluded that, "at this stage, it is sufficient" to allege that the healthcare provider owed a duty to exercise reasonable care to protect patients' Private Information from unauthorized disclosure. *Id*. at *5–6 (collecting cases).

Plaintiffs' allegations fall squarely within that recognized duty. Plaintiffs allege Riverside collected their Private Information, owed a duty to protect it, and instead disclosed it without consent. Compl. ¶ 307. Riverside also promised not to sell or use patients' medical information for marketing without written authorization and otherwise to disclose it only as stated in its Notice of Privacy Practices or permitted by law. *Id.* ¶ 126. Riverside's relationship with Plaintiffs and its express assurances reinforce that common-law duty.

The traditional duty factors lead to the same conclusion. Illinois courts consider "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Flores v. Aon Corp*., 2023 IL App (1st) 230140, ¶¶ 10-11 (citing *Bogenberger v. Pi Kappa Alpha Corp*., 2018 IL 120951, ¶ 46). The injuries resulting from the unauthorized disclosure of private health information are both foreseeable and likely. As alleged in the Complaint, HHS recognizes that such disclosures may cause identity theft, financial loss, discrimination, stigma, mental anguish, reputational harm, and risks to an individual's health or physical safety. Compl. ¶ 133. Conversely, requiring Riverside to prevent unauthorized disclosures imposes little additional burden because Riverside is already subject to state and federal privacy requirements and publicly represented that it would protect patients' medical information from unauthorized disclosure. *Id*. ¶¶ 126, 157. All four factors therefore support imposing a duty of reasonable care.

Riverside asks this Court to impose a restriction on Illinois's common law duty that Illinois courts have not recognized. As the Court in *Stein* explained, "It is not this Court's job to whittle

down Illinois law, and create restrictions that Illinois courts themselves do not recognize." 2025 WL 580556, at *9 (citing *Sabrina Roppo v. Travelers Commercial Insurance Co*., 869 F.3d 568, 596 (7th Cir. 2017)). Consistent with *Gittings-Barrera*, Plaintiffs' allegations are more than sufficient to establish a duty of care.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Riverside's Motion to Dismiss.

Date: August 24, 2026

Respectfully submitted,

By: */s/ Michael J. Casas*

**STEPHAN ZOURAS, LLC**
James B. Zouras
Ryan F. Stephan
Teresa M. Becvar
Michael J. Casas
222 W. Adams St, Suite 2020
Chicago, Illinois 60606
312.233.1550
312.233.1560 *f*
jzouras@stephanzouras.com
rstephan@stephanzouras.com
tbecvar@stephanzouras.com
mcasas@stephanzouras.com

*Attorneys for Plaintiffs and the Putative Class*

**CERTIFICATE OF COMPLIANCE**

The foregoing Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss Plaintiffs' Class Action Complaint complies with the type volume limitation of Local Rule 7.1(B)(4) because it contains **6,971** words, inclusive of all headings and footnotes.

*/s/ Michael J. Casas*

**CERTIFICATE OF SERVICE**

I, the attorney, hereby certify that on August 24, 2026, I filed the attached with the Clerk of the Court using the Court's electronic filing system and will send such filing to all attorneys of record.

*/s/ Michael J. Casas*